# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of  )
*(Briefly describe the property to be searched*  )
*or identify the person by name and address)*  )  Case No. **19MJ4125**
One black iPhone cellular telephone  )
Evidence Bag A5373162  )
 )

FILED
SEP 23 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                        DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. 1324(a)(1)(A)(ii) | Transportation of illegal aliens |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jose Castellanos, U.S. Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __9/23/2019__

*Judge's signature*

City and state: San Diego, CA                Hon. F.A. Gossett, U.S. Magistrate Judge
*Printed name and title*

## **ATTACHMENT A-1**
PROPERTY TO BE SEARCHED

The following property is to be searched:

>One black IPhone cellular telephone
>Evidence Bag A5373162
>**(Target Device 1)**

**Target Device 1** is currently in the possession of United States Border Patrol Asset Forfeiture Office Evidence Vault, located at 311 Athey Ave, San Ysidro, California.

## ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the **Target Device** includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Device** for evidence described below.

The evidence to be seized from the mobile telephones will be electronic records, communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data limited to the time period of May 25, 2019, to August 21, 2019, and is limited to the following:

a. tending to reflect planning of and/or involvement in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

b. tending to identify other facilities, storage devices, or services – such as email addresses, IP addresses, and/or phone numbers – that may contain electronic evidence tending to indicate efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

d. tending to identify travel to or presence at locations involved in efforts to smuggle illegal aliens into and through the United States;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**;

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of the transportation of illegal aliens in violation of 8 U.S.C. § 1324.

# AFFIDAVIT

I, Joe Castellanos, United States Border Patrol Agent, being duly sworn, declare and state:

## INTRODUCTION

1. This affidavit is made in support of applications for warrants to search the following electronic devices, as further described in Attachments A-1 and A-2 (collectively, the **Target Devices**), and seize evidence of crimes, specifically violations of Title 8, United States Code, Section 1324(a)(1)(A)(ii), Transportation of Certain Aliens (Felony), as more particularly described in Attachment B:

    a. one black IPhone cellular telephone
       Evidence Bag A5373162
       (**Target Device 1**, as described in Attachment A-1)

    b. one black ZTE cellular telephone
       Evidence bag A3672647
       IMEI: 863727036639486
       (**Target Device 2**, as described in Attachment A-2)

2. This warrant is requested is furtherance of an investigation and prosecution into criminal conduct by Isaiah Michael DYER and Devin Tremayne WILLILAMS, who were arrested on August 21, 2019, for the crime mentioned above. Two illegal aliens (identified as Francisco MILLAN-Tenorio and Gerardo MONTIEL-Orduna) were in the rear seat of the vehicle that DYER was driving and in which WILLIAMS was a passenger. At the time of their arrests, **Target Device 1** was seized from defendant DYER, and **Target Device 2** was seized from defendant WILLIAMS. The **Target Devices** have been securely stored since they were seized and are currently in the possession of United States Border Patrol ("USBP") as evidence and being held at the Asset Forfeiture Office Evidence Vault, located at 311 Athey Ave, San Ysidro, California.

///
///
///

1

3. Based upon my experience and training, and all the facts and opinions set forth in this Affidavit, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crime, as described in Attachment B.

4. The information contained in this affidavit is based upon my experience and training, my personal participation in the interdiction of the smuggling event, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Devices**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause for the requested warrant. Dates and times are approximate.

## EXPERIENCE AND TRAINING

5. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I am also a federal law enforcement officer within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure. I am authorized under Rule 41(a) to make applications for search and seizure warrants and to serve arrest warrants. I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

6. I am a United States Border Patrol Agent ("BPA") and have been employed since 2010. I am currently assigned to the San Diego Sector, Boulevard Station. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am currently a member of the Boulevard Station Abatement Team. I have received specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21, United States

Code, and in Title 19, United States Code, Customs law violations. I have been trained in investigating various violations of Federal Law, including alien smuggling, narcotics smuggling, and bulk currency smuggling. I have worked with other Agents with extensive experience in these investigations as well.

7. In the course of my duties as a BPA, I investigate and prepare cases for prosecution against persons involved in the inducement of the illegal entry of undocumented aliens into the United States; the smuggling of undocumented aliens into the United States; and the transportation and harboring of undocumented aliens within the United States.

8. During my tenure as a BPA, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

9. Through my training and experience, I have gained a working knowledge and insight into the typical workings of criminal organizations. I have also gained extensive information as to the operational habits of alien and narcotics smugglers. Through my training and experience I have gained a working knowledge and insight into the typical workings of alien smuggling organizations. I have also gained extensive information as to the operational habits of persons who are involved in alien smuggling. Through my training and experience and my conversations with other experienced criminal investigators, I have become familiar with the behavior, speech, routes and method of operations of criminal organizations to avoid detection and apprehension by law enforcement officers. I am aware that it is a common practice for alien smugglers to use cellular telephones and portable radios to maintain communications with co-conspirators and collect smuggling fees to further their criminal activities. I am also aware that smugglers often use cameras, to include cameras built into their cellular phone, to gather intelligence on law enforcement operations, including checkpoint operations, Agent

3

deployment and placement, Agent patrols, and Agent techniques, in order to identify vulnerabilities to aid their smuggling activities. I am also aware that alien smugglers use cameras to identify reference points and landmarks to aid them in navigating smuggling routes and directing drivers.

10. Based upon my training and experience as a BPA, consultations with law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Alien smugglers will use cellular telephones and smart devices with messaging applications because they are mobile and they have instant access to telephone calls, social media application, and text and voice messages;

    b. Alien smugglers will use cellular telephones and smart devices because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit;

    c. Alien smugglers and their accomplices will use cellular telephones and smart devices because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations;

    d. Alien smugglers will use cellular telephones and smart devices to direct the alien smuggler drivers to synchronize an exact drop off and/or pick up time of their illegal cargo;

    e. Alien smugglers will use cellular telephones and smart devices to notify or warn their accomplices of law enforcement activity, and in particular USBP enforcement activity, to include the presence and posture of marked and unmarked units, as well as the operational status of USBP checkpoints;

    f. Alien smugglers will often use cellular phones and smart devices to remotely guide illegal aliens who are crossing into the United States, providing them instructions as to where to go and what to do during a smuggling event. This is often done from over watch positions on high ground in Mexico or at the border fence. This allows smugglers to remotely control the actions of the smuggled aliens, while insulating themselves from criminal prosecution, which an alien smuggling foot guide who was physically present in the company of the aliens would be exposed to.

///

4

g. Conspiracies involving alien smuggling often generate many types of evidence including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel and payment, names, photographs, text messages, and phone numbers of co-conspirators.

11. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

12. Based upon my training and experience as a BPA, consultations with law enforcement officers experienced in smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, based upon my training and education, I have learned that searches of cellular/mobile telephones associated with smuggling investigations yield evidence:

a. tending to identify attempts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the smuggling of aliens from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in the smuggling of aliens from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the smuggling aliens from Mexico into the United States, such as stash houses, load houses, or delivery points;

5

     e.    tending to identify the user of, or persons with control over or access to, cellular/mobile telephone(s); and/or

     f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

13. Furthermore, based on my training and experience, and conversations with other law enforcement officers who investigate alien smuggling activity, I know the following:

     a.    Alien smuggling conspiracies often require detailed and intricate planning to successfully evade detection by law enforcement;

     b.    This often requires coordination and planning in the days and even weeks prior to the day of the smuggling event; and

     c.    Co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject via mobile telephone after his/her arrest to determine the whereabouts of their cargo.

## FACTS SUPPORTING PROBABLE CAUSE

14. On August 21, 2019, at approximately 12:30 a.m., I was parked in an unmarked vehicle at In Ko Pah Park Road under the overpass of the eastbound lanes of Interstate 8 (I-8) and noticed an older blue Nissan Altima (the "Vehicle") exit the eastbound lanes of I-8. This area is located approximately 30 miles east of the Tecate, California Port of Entry and 1.5 miles north of the border. I did not recognize the vehicle as being from the local area. The vehicle traveled north onto In Ko Pah Park Road to merge onto the westbound lanes of I-8. I am aware of recent trends in smuggling organizations whereby drivers will exit the I-8 eastbound lanes and immediately enter the westbound lanes of Old Highway 80 (Old 80) into Jacumba Hot Springs, California or merge back onto the I-8 westbound lanes.

///
///

6

15. I followed the Vehicle onto the westbound lane of I-8 and observed that the vehicle was traveling below the posted speed limit. In my experience, smugglers often drive below the posted speed limits as a counter-surveillance technique to see if law enforcement is following them. I passed the Vehicle and, through my rear-view mirror, I observed the Vehicle stop and pull over near call box 8-751. I relayed my observation to other agents.

16. According to a report by BPA Corey Anderson, from his position in the eastbound lanes on I-8, BPA Anderson was able to observe the Vehicle stopped at call box 8-751. BPA Anderson then saw an individual running down the berm and entering the Vehicle from the rear door. The Vehicle then began to drive westbound. BPA Anderson then turned around onto the westbound lanes and observed the Vehicle pulled over again near call box 8-747. BPA Anderson observed a second individual run towards the Vehicle and enter from the rear door. The Vehicle then slowly merged back onto the I-8. Based upon my and BPA Anderson's observations, I requested that a marked Border Patrol vehicle near the Jacumba Interchange or Ribbonwood Road assist with a vehicle stop. BPA Angel Rubio acknowledged my request.

17. Before the Vehicle was stopped, BPA Anderson observed the Vehicle slow down and stop for a third time. BPA Anderson, in an attempt to keep observing the vehicle, also stopped. BPA Anderson suspected that the two individuals that had entered the Vehicle were now going to exit. The Vehicle continued on I-8 for a short distance before exiting at the Jacumba Hot Springs exit. The Vehicle then drove towards the Chevron gas station. BPA Anderson had continued to follow behind the Vehicle and observed it drive around the gas pumps area, then subsequently re-enter the westbound lanes of I-8.

18. At approximately 12:39 p.m., BPA Rubio initiated a vehicle stop, and BPA Anderson and I assisted. When I approached the vehicle, I observed DYER in the driver seat and WILLIAMS in the front passenger seat. I also noticed two individuals in the backseat, who were later identified as MILLAN and MONTIEL. Both MILLAN and

MONTIEL confirmed that they were citizens of Mexico without documents permitting them to be in the United States. The four individuals were placed under arrest.

19. Subsequent to the defendants' arrests, Border Patrol Agent Kalina Massie seized **Target Device 1**, and **Target Device 2**. I am informed by Agent Massie that during arrest processing, defendant DYER claimed ownership of **Target Device 1**, and defendant WILLIAMS claimed ownership of **Target Device 2**.

20. According to a report by BPA Daniel Guerrero, DYER was advised of his *Miranda* rights and elected to provide a statement. DYER stated he decided to visit his sister in Yuma, Arizona, so he and his "brother" WILLIAMS traveled I-8 eastbound. DYER stated he stopped at a gas station along the way and pumped approximately $7.00 of gas before continuing their trip towards Yuma. DYER stated the Vehicle ran low on fuel and decided to do a U-turn to return to the nearest service station. DYER stated he intended to call his father and ask for $20 USD for gas. While traveling back, DYER stated he observed two individuals standing on the shoulder of the road, asking for a ride. DYER stated he stopped at their location and tried to communicate with the individuals, but both only spoke Spanish. DYER stated he figured the individuals were from Mexico but claims he had no knowledge they were illegal aliens. DYER claims he intended to ask them for $20 USD for gas; however, he was unable to communicate with them. DYER stated that even though he could not communicate with them, he decided to give them a ride to wherever they needed to go. Thereafter, he continued to the next service station, where he stated he suspected that he was being followed by a vehicle. DYER stated he did not stop and re-entered I-8 westbound lanes to head back home.

21. According to a report by BPA Eric Seyfarth, WILLIAMS was advised of his *Miranda* rights and elected to provide a statement. WILLIAMS stated that that morning, DYER asked him to go for a ride, but gave him no details as to where they were going or what they would be doing. WILLIAMS stated that they left Vista around 10:30 a.m. that morning, and that he slept most of the way. WILLIAMS further stated that he woke up at the time that people were getting into the car.

22. According to a report by BPA Jose Covarrubias, the material witnesses were each advised of their *Miranda* rights and elected to provide a statement. The material witnesses each admitted to being a citizen of Mexico without documents to legally enter or reside in the United States. MILLAN stated that he had made smuggling arrangements the day before with an unidentified smuggler via phone, for a fee of approximately $6,700. The prior evening, two smugglers guided him and MONTIEL to the top of a mountain. He stated that the smugglers gave him a cell phone to stay in contact with them, and that when he and MONTIEL made it to the freeway at approximately 4:00 a.m., he called the smugglers to tell the smugglers they had arrived there. He said that they were instructed to run to the north side of the freeway and wait, and that the load drivers would call out both of their names when he arrived. MILLAN said that at noon, a blue 4-door sedan stopped near their location, and someone shouted both of their names. MILLAN and MONTIEL then entered the vehicle. He said that they drove for approximately five minutes before being pulled over by Border Patrol, and that both the driver and passenger had spoken on a cell phone during that time. In a photo line-up, MILLAN did not identify anyone as the driver or passenger of the vehicle.

23. MONTIEL stated that he took a picture of the call box number to send to the smugglers in Mexico to coordinate with the driver of the vehicle. He stated that shortly after, Border Patrol arrived, and he and MILLAN ran in opposite directions. He subsequently called one of the smugglers, who told him the load vehicle had picked up MILLAN and instructed him to go back to the call box. MONTIEL was able to identify DYER from a six-pack photographic lineup as the driver of the vehicle.

24. Based upon my experience and investigation in this case, I believe that DYER, WILLIAMS, the material witnesses, and other persons, as-yet-unknown, were involved in an alien smuggling venture and that WILLIAMS and DYER used the **Target Devices** to coordinate with the as-yet-unknown persons to bring the aliens into the United States and/or transport them further into the United States. Additionally, I believe that recent calls made and received, telephone numbers, contact names, electronic mail (e-mail) addresses,

9

appointment dates, text messages, pictures, and other digital information are stored in the memory of the **Target Devices**, which may identify other persons involved in alien smuggling activities.

25. I am aware that smuggling conspiracies require planning to successfully evade detection by law enforcement. In my professional training and experience, this may require planning and coordination in the days and weeks prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine their whereabouts. Given this, I respectfully request permission to search the **Target Devices** for data beginning on May 25, 2019, up to and including August 21, 2019.

## METHODOLOGY

26. It is not possible to determine merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books, and can be mini-computers allowing for electronic mail services, web services, and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and, instead, store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored

that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

27. Following the issuance of this warrant, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

28. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days absent further application to this Court.

## CONCLUSION

29. Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that DYER and WILLIAMS used the **Target Devices** to facilitate violations of Title 8, United States Code, Section 1324.

30. I also believe that probable cause exists to believe that evidence of illegal activity committed by Defendants and others continues to exist on the **Target Devices** because they have been securely stored since their seizure.

31. Therefore, I respectfully request that the Court issue this warrant authorizing me, an agent with United States Border Patrol, or another federal law enforcement officer specially trained in digital evidence recovery, to search **Target Device 1** and **Target Device**

///
///
///
///
///
///

**2**, as described in Attachments A-1 and A-2, respectively, and seize the items listed in Attachment B, using the methodology described above.

    I swear the foregoing is true and correct to the best of my knowledge and belief.

                      Joe Castellanos
                       Border Patrol Agent
                       U.S. Border Patrol

Subscribed and sworn to before me this ___23___ day of September, 2019.

_____
HONORABLE F.A. GOSSETT
United States Magistrate Judge

12